UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND
CIVIL ACTION NO. 08-69-JGW

AMELIA EDINGTON, as
Administratrix of the Estate of
Danny W. Edington, Jr., et al.,                                    PLAINTIFFS

VS.

MADISON COAL & SUPPLY CO., INC.,                                   DEFENDANT

**MEMORANDUM OPINION AND ORDER**

**I**. **Introduction**

The parties consented to disposition of all pending motions and trial before the undersigned magistrate judge, pursuant to 28 U.S.C. §636(c). A two-day bench trial was held on September 20-21, 2010, and was recorded by Official Court Reporter Joan Averdick. Having heard the testimony and having reviewed all of the evidence, the court now finds for the defendant and against the plaintiffs.

The two plaintiffs in this case and the defendant each submitted proposed findings of fact and conclusions of law prior to trial. While the court has incorporated or adopted many of the defendants' findings of fact and conclusions of law, all findings of fact and conclusions of law have been made pursuant to Rule 52 of the Federal Rules of Civil Procedure. "The fact that proposed findings of fact, prepared and submitted by the successful attorneys, have been adopted by the trial court does not detract from their legal force or effect. When adopted, such findings become the findings of the court, and are entitled to the same respect as if the judge...had drafted them." . *See Kilburn v. United States,* 938 F.2d 666, 672 (6th Cir. 1991)(*quoting O'Leary v. Liggett Drug Co.,* 150 F.2d 656, 667 (6th Cir.), *cert. denied,* 326 U.S. 773, 66 S. Ct. 231 (1945)).

The findings of fact and conclusions of law represent this court's consideration of all the evidence presented for trial, including the exhibits and testimony presented both live and by deposition, and the court's observation of the demeanor, qualifications, and credibility of witnesses. Subheadings used herein are for the convenience of the court. If a finding of fact or conclusion of law is pertinent to a different determination than the heading under which it appears, it should be deemed adopted as if made under the appropriate heading.

**II. Findings of Fact**

1. This case involves a consolidated action arising from an accident that occurred on May 26, 2007 near Mile 374 on the Ohio River, when a tow boat (the M/V Tennessee) operated by Captain James Smiley and a pleasure boat operated by Danny Edington passed each other. Danny W. Edington, Jr. ("Decedent") drowned in the incident.

2. The M/V Tennessee was owned and operated by defendant Madison Coal & Supply Company, Inc. ("MCSC"), an inland river towing company. MCSC was the employer of all crew members of the M/V Tennessee, including Capt. James Smiley.

3. Capt. Smiley has worked in the inland towing industry for over 20 years and has experience operating towboats in a variety of river and traffic conditions. At all relevant times, he was properly licensed by the Coast Guard. He has never had any action taken against his license. As part of his training, Captain Smiley has received periodic continued training on the Inland Navigation Rules, also referred to as the "Rules of the Road," throughout his career.

4. Over the course of his career, Capt. Smiley has navigated the Ohio River in the vicinity of Mile 374 hundreds of times and has encountered thousands of pleasure boaters. He is the regularly assigned master of the M/V Tennessee. He has never been involved in any

incidents or casualties other than the one at issue in this litigation.

5. Plaintiff Amelia Edington, as Administratrix of the Estate of Decedent and next friend for the Decedent's and Amelia's minor sons, Michael Wayne Edington and Danny W. Edington, III, (collectively "Edington"), has asserted causes of action against MCSC for wrongful death, loss of parental consortium, and loss of spousal consortium.

6. Plaintiff Brandy Bear ("Bear") also has asserted a claim for maritime negligence against MCSC (originally filed as Ashland Civil Action No. 08-cv-77), seeking damages for the negligent infliction of emotional distress. Bear is Amelia Edington's second cousin and was a passenger in the Edington boat on May 26, 2007.

7. Approximately one week prior to the fatal incident, Decedent acquired a 1995 17' Hurricane deck boat. The Hurricane boat is equipped with a driver's seat, a passenger's seat, a bench seat to the rear of the operator's seat, and a bench seating area that forms a semi-circle in the forward bow area of the vessel. The testimony of Phillip Dummit, Decedent's father-in-law, indicates that Decedent had briefly operated the Hurricane boat on one prior occasion on the Ohio River.

8. On May 26, 2007, Decedent Danny Edington, Amelia Edington, their two sons, and Bear, launched the Hurricane at Kinniconnick Creek at around 4:30 p.m. The weather conditions were calm and the river was not congested.

9. Decedent was operating the boat. He had no specific training on the operation of the boat or regarding the Inland Navigation Rules.

10. The Edington boat traveled to the Ohio River, heading downriver toward Concord, Kentucky, before turning and heading back upriver. As the pleasure craft headed upriver, the

Decedent stayed to the Kentucky side of the shoreline.

11. All passengers except Decedent and his infant son Danny were seated in the bow section of the boat, which cased the bow to have a "bow down" attitude. Decedent was driving the Hurricane, with Danny next to him.

12. Each of the two minor children wore a personal flotation device ("PFD") but none of the adult occupants of the Hurricane, including Decedent, were wearing a PFD.

l3. The M/V Tennessee is a 4,320 horsepower vessel, equipped with a GPS as part of a CEACT system, and horn or whistle. All of the equipment in the M/V Tennessee's pilothouse was in good, working condition.

14. The tow of the M/V Tennessee consisted of 14 barges. The tow was configured three barges wide. The starboard and center strings of the tow were five barges long. The port string, however, was only four barges long, leaving a notch at the head of the tow on the port side. Eleven of the barges were loaded and three were empty. The lead barges in the starboard and center strings were both empty. The lead barge in the port string was loaded. All three barges at the head of the tow were rake barges.

15. The M/V Tennessee's tow was 105' wide and 975' long. The M/V Tennessee is 150' by 42', making the total length of the tow boat with its tow equal to 1,125'.

16. Bow wake is created from the bow of a vessel or tow passing through the water as it transits the river. Two waves - one from the bow and one from the side "notch" of the tow, created the bow wake on the port side of the M/V Tennessee.

17. Captain Morrow, plaintiff's expert, testified that the Pilothouse Log indicated that the M/V Tennessee had traveled at an average speed of 9.3 miles per hour during the period of

time prior to the accident, which speed would naturally produce a larger wake than that created by a speed of 7.5 miles per hour. However, Capt. Morrow conducted no experiments or simulations to determine the precise size of the wake generated from the bow.

18. Wheel wash consists of turbulent waves emitted from the stern of a boat as a result of the vessel's propellers. The M/V Tennessee's wheel wash was approximately 4' directly behind the vessel, and quickly dissipated in a "V" formation as it moved away from the stern of the vessel. As with the size of the wake, Capt Morrow could not testify to the precise size of the wheel wash generated from the tow.

19. The term "wake" was used by various witnesses, and was used both in reference to wheel wash and to bow wake. For clarity in this opinion, the term "wake" is used to refer only to the type of wake emanating from the bow, and not to waves resulting from wheel wash emanating from the stern behind the boat.

20. At 4:00 p.m. on May 26, 2007, the M/V Tennessee departed Wheelersburg, WV. Capt. Smiley came on watch at approximately 5:30 p.m. Capt. Smiley was the only person present in the pilothouse that evening.

21. As the M/V Tennessee continued to travel down river in the vicinity of Mile 374, Capt. Smiley was steering to port in preparation for transiting a bend in the river. Capt. Smiley credibly testified that the M/V Tennessee was positioned roughly in the middle of the channel and was traveling at a speed of 7- 7.5 mph, approximately 600 rpm. Capt Smiley was aware of the precise speed of the tow at the time of the accident because he noted it on the CEACT system.

22. Capt. Smiley testified that he was "at least" 400 feet, and very likely further, from

the Kentucky side of the river. The evidence showed that the river was 1200 feet in width at Mile 374. I conclude based on all the testimony that Capt. Smiley was in fact proceeding in the middle of the navigable channel.

23. One witness for plaintiff, Wes Cooper, testified that he observed a tow boat in the vicinity traveling at a greater rate of speed, and that his pontoon boat was swamped on the opposite (Ohio) side of the river as a result. However, Mr. Cooper's testimony concerning the time of his encounter and other details was inconsistent. On cross-examination, he admitted that the time that his boat was "swamped" was approximately 4 hours prior to the accident at issue in this litigation, making it less likely to have been the M/V Tennessee. Moreover, Mr. Cooper was unable to identify whether it was the M/V Tennessee or another tow boat that generated the wave that affected his pontoon boat. For these reasons, the court does not find Mr. Cooper's testimony to be probative concerning the accident at issue.

24. During the approximately two hours Capt. Smiley was on watch that evening, he encountered one or two other pleasure craft without incident.

25. When Capt. Smiley first observed the Edington boat, it was between ½ and 3/4 of a mile away. He maintained watch of the Edington boat as it approached and passed the M/V Tennessee's tow.

26. The Edington boat was traveling upriver at a speed of approximately 20 mph.

27. As the two vessels approached each other, they were not traveling in a head on course. Neither vessel signaled with a whistle or by other means. It is the custom and practice of tow boats not to sound a horn or whistle when encountering pleasure craft on the Ohio River, so long as there is no apparent danger in passage.

28. Based upon its position, Capt. Smiley understood the Edington boat's intention was to pass on the port side of the M/V Tennessee and its tow, while keeping a safe distance.

29. Capt. Smiley observed the Edington boat as it initially passed the tow at a distance of approximately 150 feet away. Following the accident, Capt. Smiley drew the relative positions of the vessels on the river at the time that he saw the Edington boat pass alongside the M/V Tennessee. Notwithstanding some contrary testimony by the Edington passengers, which I do not find credible, I conclude that the Edington boat did not encounter any waves or bow wake of unusual size as it passed the M/V Tennessee.

30. As the Edington boat passed the stern of the M/V Tennessee's tow, it unexpectedly turned toward the tow's port side, into waves caused by the wheel wash of the tow.

31. The testimony of the occupants of the Edington boat diverged in their recollection of events, including such details as the precise size and how many separate waves contacted the Hurricane. There is little doubt that at least some of the conflict in testimony was due to the difficulty of recalling details of such a traumatic event. In part because of the inconsistencies of the testimony with other evidence, I cannot credit the testimony of the occupants of the Edington boat that it was the wake alongside the tow boat, rather than the wheel wash just behind the stern of the M/V Tennessee, that they encountered.

32. Drawing closer to the tow boat on the port side near the 3-4 foot waves created immediately behind the tow by its wheel wash, the Edington boat drew close enough to encounter a wave large enough to come over the low-lying bow of the Hurricane. The wheel wash wave encountered by the Hurricane at some distance off the stern was no more than 2 feet at the point of contact due to the dissipation of its size over distance. However, the speed and

angle with which the Edington boat encountered the wave, combined with the Hurricane's bow-down position, caused the wave to drench the seated occupants in the bow of the boat with water and spray, and also flooded the Edington boat.

33. The motivation for the Decedent's decision to turn toward the wheel wash will never be known. Although the defendant suggested that the motive may have been to "jump" the larger waves behind the tow for sport, the occupants of the Edington vessel testified that they had never witnessed the Decedent take a similar action. Regardless of the motive, all credible evidence points to the fact that the Decedent, a novice boater, did in fact turn his vessel toward the wheel wash coming from the stern of the tow.

34. When the first wave hit, the passengers in the front of the boat began to rush to the back and the Decedent, Danny Edington, immediately slackened his speed. The Decedent's action in drastically reducing the speed, in combination with his attempt to maneuver the boat toward the port side, caused the bow of his boat to dip further. A second wave thereafter washed over the Edington boat, ultimately causing it to torpedo, bow first, into the river.

35. The boat capsized before the passengers in the bow area reached the back of the 17' boat. When the Edington boat capsized, its passengers were thrown into the water.

36. The accident occurred at approximately 7:35 p.m.

37. At the time of the incident, the M/V Tennessee was positioned in the middle of the navigable channel. The tow boat could have been positioned safely another 25 feet toward the starboard side of the channel. However, it was customary, to ensure safe passage, to travel in the middle of the channel at Mile 374.

38. After observing the Edington boat swamp through his back window, Capt. Smiley

stopped the M/V Tennessee to render assistance. Using a small rescue boat, members of the M/V Tennessee crew were able to reach the site of the swamped Edington boat within 5 minutes.

39. The Edington passengers initially clung to the swamped boat. Except for the Decedent, the remaining passengers were assisted to shore by nearby witnesses. The Decedent slipped from the boat and drowned. His body was recovered the following day.

40. Despite Capt. Morrow's testimony that the M/V Tennessee was traveling at a faster rate of speed at some point prior to the accident, I find credible Capt. Smiley's testimony that he observed his speed on the CEACT system just prior to the accident. According to that contemporaneous data, the M/V Tennessee was traveling at a speed of approximately 7.5 mph when it encountered the Edington boat.

41. Neither the M/V Tennessee nor the Edington boat sounded a warning whistle as the vessels approached each other.

42. The M/V Tennessee was the stand-on vessel, meaning that the Edinngton boat was the give-way vessel as defined under Rule 15 of the Inland Rules of Navigation. As such, the M/V Tennessee had the right of way and the Edington boat had the obligation to take early and substantial action to keep well clear of the M/V Tennessee.

43. Two experts provided contrasting testimony concerning Capt. Smiley's conformity with the Rules of the Road: James Allen, testifying by deposition for plaintiff, and Capt. Samuel Schropp, testifying live for defendant. James Allen, a retired Coast Guard Chief Warrant Officer, testified as plaintiff's expert on marine safety. He opined that Capt. Smiley failed to maintain his course and speed in accordance with the obligations of a stand on vessel as he steered to the port during the encounter with the Edington vessel. He further opined that Capt. Smiley should have reduced his speed once he recognized that the Edington boat was bow down.

44. Defendant's expert, Captain Samuel D. Schropp, testified as an expert on the navigation of towing vessels and small craft operation. Captain Schropp opined that Capt. Smiley did not commit any negligent acts or omissions and that Decedent Danny W. Edington, Jr. operated his pleasure craft negligently.

45. Capt. Schropp opined that Mr. Edington was negligent in that he lacked sufficient experience to operate the pleasure craft on the Ohio River. He improperly loaded his boat by permitting passengers to sit in a manner that produced a bow down attitude, and improvidently made a course adjustment into the wheel wash of the M/V Tennessee. He further violated the Rules of the Road by failing to provide the M/V Tennessee with sufficient room to operate in the navigable channel.

46. Capt. Schropp opined that in his experience the wake from the head of Capt. Smiley's tow would be around 18 inches in height and the wheel wash wave would be between 2 and 4 feet in height.

47. A few hours after the accident, Capt. Smiley completed an incident report at the request of his employer, MCSC. Regrettably, Capt. Smiley left blank the narrative portion of that form. Defense witness Allen Hall testified that the section was not completed because it was not "important" to the report, testimony that I do not find credible. Nevertheless, I find credible Capt. Smiley's explanation for the omission. Upon questioning from the court, he explained that he omitted that portion in large part because he had never before completed a similar form for any reason for his employer. Moreover, the information in the contemporaneously created report is wholly consistent with the cause of the accident being the Decedent's action in traveling too fast and getting too close to the wheel wash emanating from

the tow boat.

### III. Conclusions of Law

48. A cause of action lies under general maritime law for wrongful death resulting from the violation of maritime duties. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 380 (1970). In this case, the issue of wrongful death liability is governed by general maritime law, while issues relating to the plaintiffs' damages are governed by Kentucky law.

49. The elements of maritime negligence "are generally the same as a common law negligence action, i.e., duty, breach, causation, and damages." *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 Fed. Appx. 914, 919 (6th Cir. 2004)(citing *Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001)).

50. Under general maritime law, a party's negligence is actionable only if it is the "legal cause" of the plaintiff's injuries. *Danaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992). Legal cause requires that the claimed negligence must be a substantial factor in the injury. *Id.*

51. Proportional division of liability applies to all admiralty cases based on principles of comparative fault. *Phillips Petroleum Co. v. Stokes Oil Co., Inc.*, 863 F.2d 1250, 1255 (6th Cir. 1988). In this case, there exist only two potentially liable parties: the Decedent, Danny W. Edington, Jr., and MCSC's Capt. James Smiley.

52. The court must first determine whether the defendant was negligent, and if such negligence was a substantial cause or legal cause of the injuries sustained by the plaintiffs. If so, the court will allocate damages to the plaintiff in the amount of the total loss, minus the damages attributable to the plaintiff's own proportionate fault. However, admiralty law also recognizes the doctrine of superseding causes, such that the extraordinary negligence of a plaintiff can in

some cases supersede and cut off proximate causation of any negligence or misconduct on the part of the defendant. *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840, 116 S. Ct. 1813, 1819 (1996).

53. A moving vessel owes a duty of care to appreciate the practical effect of its wake and to take reasonable precautions to avoid creating unusual swells that may injure others. *See West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673, 674 (5th Cir. 1951).

54. The Inland Navigation Rules, otherwise referred to as the "Rules of the Road" supply applicable standards of care for determining negligence in admiralty actions. See 33 U.S.C. §2001, et seq.

55. Rules of the Road with particular relevance to the facts of this case include Rule 6, Rule 8, Rule 9, and Rule 34. If it is shown that either party violated one of the applicable rules, the burden shifts to the violator of the rule to show that its violation could not have been the cause of the accident.

56. Rule 6 requires vessels to proceed at a safe speed to avoid collision. I find that the speed of the M/V Tennessee, at 7.5 mph at the time of the accident, was within the "safe speed" required by Rule 6. The wake created by the speed of the M/V Tennessee and its tow was reasonable under the prevailing conditions and did not constitute an "unusual swell." The bow wake created by the M/V Tennessee's tow on May 26, 2007 did not exceed 18 inches. The wake had no significant impact on the Edington boat as it passed the M/V Tennessee.

57. Likewise, the amount and size of the wheel wash created by the M/V Tennessee was reasonable and did not constitute an "unusual swell." Its size should have been anticipated by Decedent under the prevailing conditions, and would not have impacted the Edington boat but for Decedent's own negligence.

58. Rule 8 governs actions necessary to avoid collision. Captain Smiley did not violate Rule 8 of the Rules of the Road by failing to slacken his speed to avoid collision with the Edington boat. Based upon the distance between the vessels and the course that the vessels were embarked on for safe passage, as well as the amount of bow wake generated from the tow boat, it was unnecessary to further slow the M/V Tennessee to permit safe passage. The collision between the wheel wash emanating from the stern of the M/V Tennessee and the Edington boat was not caused by any action taken by Capt. Smiley. Rather, the collision was caused solely by the actions of the Decedent in failing to keep a safe distance upon passing the tow boat and instead turning into the wheel wash.

59. Captain Smiley maintained a safe course in traveling in the center of the navigable channel, even though that action placed him slightly nearer to the Kentucky side of the river at Mile 374. While Captain Smiley would have been able to maneuver the M/V Tennessee 25 feet more toward the starboard (Ohio) side of the river, the Rules of the Road do not require such precision of a captain of a vessel the size of the M/V Tennessee at every instant of its travel.

60. Rule 9 generally requires downward bound vessels to keep to the starboard side in Narrow Channels such as the Ohio River. Capt. Smiley did not violate Rule 9(a)(i) because the rule requires only that a pilot keep to the starboard side as much as "safe and *practicable*." As a matter of law, evidence that Capt. Smiley might have theoretically been able to maneuver the M/V Tennessee as much as 25 feet closer to the starboard side at Mile 374 does not constitute a violation, because 25 feet is legally insignificant on the facts presented. The Rule by its own terms must be interpreted in light of the totality of the circumstances presented. *See also* Rule 2(b). The evidence here was that, while *possible*, it was not *practicable* for the pilot of a large vessel like the M/V Tennessee to be closer to the starboard side than Capt. Smiley achieved.

61. In addition, Rule 9 states that the downward vessel - in this case the M/V Tennessee - has the right-of-way over the upward vessel, the Edington boat.

62. Rule 16 required the Edington boat to keep out of the way of the M/V Tennessee, and to take early and substantial action to stay well clear. 33 U.S.C. §2016. The Decedent violated Rule 16 by his action in turning into the wheel wash rather than completing passage of the tow boat at a safe distance.

63. Rule 34 provided that both vessels should sound whistle signals upon meeting. Both Capt. Smiley and Decedent violated Rule 34 in this case.

64. Defendant demonstrated through testimony by both fact and expert witnesses that Capt. Smiley's technical violation could not have been a cause of the accident in this case. Even plaintiff's own expert, James Allen (TR at 40), conceded that the failure to sound the whistle was not a substantial factor or legal cause of the accident. Therefore, the defendant is not liable for its technical violation of Rule 34. *See Pearce v. United States*, 261 F.3d 643, 648 (6th Cir. 2001)(citing *The Pennsylvania*, 86 U.S. 125, 136 (1873)).

65. By contrast, the Decedent clearly violated Rules 9 and 16 by failing to stay well clear of the M/V Tennessee. Such violations were the direct, proximate, and sole cause of the accident. The Edington boat unexpectedly changed course toward the port stern of the M/V Tennessee in an unforeseeable and dangerous manner. The course change of the Edington boat, coupled with the bow down attitude of that vessel, directly caused the chain of events that led to the damages sustained by the plaintiffs, including the untimely death of Danny W. Edington, Jr.

66. The cause of the accident was the Edington boat's failure to stay well clear of the M/V Tennessee, and the Decedent's decision to steer into the wheel wash toward the port stern of the Tennessee immediately after passing the tow boat. Sadly, the Decedent's own actions and

reactions caused the Edington boat to capsize. The Decedent was also negligent in not wearing a PFD.

**IV. Order**

Because the actions of the Decedent were the sole cause of the tragic accident that occurred on May 26, 2007 and plaintiffs' resulting damages, **IT IS ORDERED THAT** plaintiffs shall take nothing and judgment as a matter of law be entered in favor of the defendant. Accordingly, a separate order of judgment shall be filed herewith

This the 5th day of October, 2010.

Signed By:
J. Gregory Wehrman
United States Magistrate Judge